### JOSIAH SCOTT v. E. G. WILLIAMS.

No. 14,719. (87 Pac. 550.)

SYLLABUS BY THE COURT.

1. TITLE AND OWNERSHIP—*Adverse Possession—Mistake as to Boundary.* One who has title to a certain quarter-section of land, and by mistake as to the boundary-line occupies a strip of land in an adjoining section owned by another, without any intention to take and hold land beyond the section-line or to claim land which does not belong to him, will not acquire title to such strip by adverse possession.

2. EVIDENCE—*Record Containing an Original Paper.* A volume of the records of permanent surveys of the county surveyor, forming a part of the public records of the county, is not discredited as evidence because it may contain an original paper of a survey instead of a copy of such paper.

Error from Sumner district court; CARROLL L. SWARTS, judge. Opinion filed October 6, 1906. Affirmed.

*Ed. T. Hackney,* and *F. A. Dinsmore,* for plaintiff in error.

*W. W. Schwinn,* for defendant in error.

The opinion of the court was delivered by

JOHNSTON, C. J.: This was an action of ejectment to recover a triangular strip of land lying along the section-line between sections 2 and 3, in township 35 south, of range 4 west of the sixth principal meridian. Josiah Scott was the owner of what is spoken of as the northeast quarter of section 3, composed of the south half of the northeast quarter and of lots 1, 5 and 6 of section 3, and E. G. Williams was the owner of the west half of the northwest quarter of section 2. It appears that Arthur Scott settled upon lots 5 and 6 and the south half of the northeast quarter of section 3 in 1876, and obtained a patent to the land from the United States in 1882; and that in 1877 George W. Scott settled upon lot 1, the patent for which was issued to him in 1882. In 1881, George W. Scott conveyed this lot to Arthur Scott, and in 1890 Arthur Scott deeded lots 1, 5 and 6 and the south half of the northeast quarter of section 3 to the plaintiff, Josiah Scott, in whom the title has since rested. When the Scotts settled on this land the corner-stone between sections 2 and 3 on the north line of the sections was not found. In 1878 Walton, a deputy county surveyor, undertook to survey a public road on the section-line between these sections, and laid it along the east line of the strip in question, but the corner-stone was not found. In 1879, upon an agreement of the landowners in that region, a survey was made by Smith, the county surveyor, for the purpose of finding and establishing the corners and division lines, and he found the section line to be on the west side of the strip in question. Between these surveys there was left the strip in controversy, which was about 160 rods long, four or five rods wide at the south end, and about twelve rods wide at

29—74 KAN.

the north end. The following sketch will serve to indicate the location and extent of the tract:

| Lot 1. | | |
|---|---|---|
| Lot 5. | Lot 6. | |
| S. ½ of the N. E. ¼ of Sec. 3. | | |

*Smith's Survey.* *Walton's Survey.* W. ½ of the N. W. ¼ of Sec. 2.

Notwithstanding the Smith survey, the Scotts occupied and farmed the land over to the Walton survey for more than fifteen years. In 1903 the county authorities opened the road on the Smith survey, when Williams took possession of the strip, and the present action was soon afterward brought by Scott. The verdict of the jury was for the defendant, finding that the government corner between sections 2 and 3 on the north line of the sections was in accordance with the Smith survey, and that Walton, who made the first survey, did not find the government corner.

One of the points in the case, and in fact the principal one, was, Where was the true section-line established by the government survey? Was it the one traced by the Walton survey, or by the later survey of Smith? The jury found, upon conflicting evidence, that the Smith survey was upon the true line; and that the strip in controversy is a part of the west half of the northwest quarter of section 2, claimed by the defendant, must be regarded as settled.

It is claimed, however, that the possession and use of this strip of land for over fifteen years by the Scotts gave title by prescription or limitation. To have that effect the possession must be hostile and adverse as against the owner. If Scott only claimed title to the northeast quarter of section 3, and mistakenly occu-

pied land in section 2, believing it to be a part of his quarter when it was not, his possession was not adverse. In *Winn v. Abeles,* 35 Kan. 85, 10 Pac. 443, 37 Am. Rep. 138, it was held that a possession originating in and continuing under a mistake as to a boundary-line, with no intention on the part of the occupant to claim beyond the true line, will not give title by adverse possession. The rule was restated and applied in the recent case of *Shanline v. Wiltsie,* 70 Kan. 177, 78 Pac. 436, where it was said:

"As between the respective owners of adjoining lands, a physical possession held by one of them of a part of his neighbor's ground, taken and held through a misapprehension of the location of the boundary-line, is not adverse, and, however long continued, will not ripen into a title or set the statute of limitations in operation, for the reason that there is no intention on the part of the occupant to exercise, or on the part of the owner to suffer, any dominion beyond the true line, wherever it may be." (Page 181.)

Now, the testimony of the plaintiff and his grantors is to the effect that they claimed no more land than was in the northeast quarter of section 3; no more than they were entitled to under the patents and deeds conveying that quarter-section. They claimed the land to the section-line, as established by the government survey, and had no purpose to take or hold possession of Williams's land, or of any land in section 2. Plaintiff did occupy a strip of Williams's land for more than the statutory period, and, if he had intended to claim beyond the true line, there would be reason to call the occupancy adverse. It is clear, however, from his testimony that his occupancy was based upon a mistake as to the boundary-line, and because he believed the strip to be a part of his own quarter-section. According to his own testimony the possession was not hostile or adverse, and therefore none of the questions raised by him as to the application of the statute of limitations is material.

Plaintiff complains of the introduction of a record

of the county surveyor. The objection was that the record appears to have been made up in part of the original papers of the survey, and it is argued that the statute contemplates that only copies of them shall constitute the record. That which was introduced was placed in a volume of the permanent surveys and kept among the permanent records of the county. The statement of the witness who presented it that the papers recorded in the book appeared to him to be the originals did not take from the record its official character or destroy its force as evidence. He stated that it was a permanent record of the county, and the fact, if it be a fact, that it included an original paper instead of a copy of such paper did not impeach the record or destroy its authenticity.

Some other objections are mentioned by counsel, but they appear to be immaterial, and as no error is seen in the record the judgment of the court is affirmed.

All the Justices concurring.